**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-22671-CV-MOORE**
**MAGISTRATE JUDGE REID**

PAUL R. BROSKY,

      Petitioner,

v.

SEC'Y, FLA. DEP'T OF CORR.,

      Respondent.

## <u>REPORT OF MAGISTRATE JUDGE</u>

Petitioner has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 attacking his judgment of conviction in Case No. F02-026611, Eleventh Judicial Circuit of Florida, Miami-Dade County. [ECF No. 1]. As discussed below, the petition should be DENIED.

## I.    Background

The state charged petitioner with armed sexual battery by a law enforcement officer and armed kidnapping. [ECF No. 21-1 at 158[1]]. Petitioner went to trial.

---

[1] All page citations to ECF entries refer to the page-stamp number at the top, right-hand corner of the page.

A.    <u>Trial Testimony</u>

1.    *T.C. (victim)*

On or about August 30, 2002, T.C. and her boyfriend, Danny Campos, were driving to a restaurant when a police officer (whom she identified in court as petitioner) pulled them over and ordered them out of the vehicle. [ECF No. 22-12 at 70, 72, 74-75, 89-90]. Petitioner kept T.C.'s personal identification, searched the car and trunk, and found marijuana in Campos's bookbag. [*Id.* at 73-76]. Petitioner told them that they had to follow him or they would be in much more trouble, that they could be shot if they ran, and that he knew where they lived. [*Id.* at 76-77].

Pursuant to petitioner's orders, Campos and T.C. got in their car and followed petitioner to a dimly lit area near a warehouse. [*Id.* at 79-81]. Petitioner told Campos to remove his shoes and socks, patted him down, and opened his pants and shined a flashlight inside of them. [*Id.* at 81]. After Campos told petitioner that "there was a scale and a pipe in the car," petitioner took his car keys and "put him in the cop car." [*Id.* at 81-82].

Petitioner told T.C. to exit the car to help him open the trunk. [*Id.* at 82]. Petitioner was pacing and asking T.C. what she thought he should do. [*Id.* at 83-84]. T.C. was "crying hysterically" and told petitioner to give them a ticket and let them go. [*Id.* at 84].

Petitioner told T.C. that a lady could search her, but he would have to take her to jail, where a "big black woman would have to put three fingers and penetrate [her] inside to check her for drugs." [*Id.* at 85]. Further, he told T.C. that, if she let him search her, she would not have to go to jail. [*Id.*]

T.C. gave petitioner permission to search her. [*Id.*] As she cried hysterically, he separated her panties from her skin and "shined a flash light in there." [*Id.*] Petitioner then made her lift up her shirt and pull her bra inside out, upon which petitioner grabbed her breasts with both hands for a long time. [*Id.* at 85-86].

For a moment, T.C. pulled up her pants and put her shirt down. [*Id.* at 86]. Then, petitioner had T.C. "take [her pants] back down, . . . lift [her] leg up, [] pull [her] panties to the side, . . . . [and] penetrate three fingers in [her] vagina." [*Id.* at 87]. As she did that, petitioner "squatted down very close, less than a foot, and flashed a flash light there." [*Id.* at 87-88].

T.C. stopped petitioner from pulling up her pants and did so herself. [*Id.* at 88]. Petitioner grabbed her by the arm and told her that no one had to know about the incident. [*Id.* at 89]. Petitioner gave her some antibacterial gel and a napkin to clean her hands. [*Id.*] She continued to cry. [*Id.*]

Petitioner let Campos out and told him that he was "very lucky" and had a "good girlfriend." [*Id.*]  Before Campos left, petitioner returned their identification

and told them to say, if pulled over, that he let them go because Campos's "uncle or cousin [was] a cop." [*Id.* at 91].

Danny and T.C. settled a civil lawsuit based on petitioner's conduct and received $47,000. [*Id.* at 95].

### 2.    *Campos*

On or about August 30, 2002, petitioner and T.C. were driving to a restaurant when petitioner pulled them over. [ECF No. 22-11 at 95-97, 99; ECF No. 22-12 at 39]. Petitioner ordered them to follow him to a desolate area near a warehouse. [ECF No. 22-12 at 24-25].

There, petitioner told Campos to remove his shoes. [*Id.* at 9]. Petitioner found a scale, pipe, and marijuana in the car. [*Id.* at 11-12]. Even though the trunk lid was raised, Campos could see that T.C. was "crying" and "visibly shaken." [*Id.*] For his part, Campos was "sweating," "panicking," and "picking his toenails." [*Id.* at 13-14].

Campos saw a flashlight being used and someone crouching down. [*Id.* at 15]. Petitioner later told him that he should thank T.C. and that she was the reason he was letting them go. [*Id.*]

Petitioner put "disinfectant gel" on T.C.'s hands. [*Id.* at 16]. Petitioner returned their licenses and told them to say that they had a relative who was a police officer if anyone wanted to know why the stop took so long. [*Id.* at 17-18].

Campos remembered petitioner's name from his badge and wrote down his license plate number. [*Id.* at 19]. Campos and T.C. settled a lawsuit with the county and received $46,000. [*Id.* at 26-27].

### 3.    *Sergeant Spier*

Sgt. Spier, an investigator for the Miami-Dade Police Department ("MDPD"), did not find a report that petitioner had conducted a traffic stop of T.C. and Campos. [ECF No. 22-6 at 40-51, 50]. Surveillance video from the area of the incident showed a police car and another vehicle in the area and was "consistent with" what T.C. and Campos had stated about the incident. [*Id.* at 93].

### 4.    *Norma Hurtado*

When the incident occurred, Hurtado was working in a building in the area. [ECF No. 22-9 at 73-74]. There was a police car and another car and the latter's trunk was open. [*Id.* at 75, 77].

### 5.    *Sharon Hinez*

Hinez worked as a crime lab analyst for the MDPD. [*Id.* at 83]. DNA extracted from a toenail found in petitioner's cruiser matched Campos. *See* [*id.* at 94-97].

### 6.    *Felix Libre*

Libre testified that, on August 30, 2020 at 10:30 p.m., he and his girlfriend were in a park after hours drinking beer. [ECF No. 22-9 at 130, 132-33]. Petitioner, whom he identified in court, ordered them to approach his car and they complied.

[*Id.* at 134]. Petitioner asked if they had any weapons or drugs and Libre gave him his pocketknife. [*Id.* at 134-35].

After searching Libre, petitioner said that he could bring a female officer to search his girlfriend but that they would be arrested and fined. [*Id.* at 135-36]. Then, petitioner told Libre to put the beer in his car and that he would "forget about the whole thing." [*Id.* at 136].

When Libre returned, his girlfriend was in the officer's car. [*Id.* at 137]. Petitioner started writing a warning and talking about random things, including some kids that dropped a bag of marijuana and a scale on the ground when petitioner chased them. [*Id.* at 138]. Petitioner showed Libre the marijuana. [*Id.*]

### 7.     *S.P.*

On or about August 8, 2002, S.P. and a boy named "Alonzo" were "parked on a road by [her] house." [*Id.* at 146-47]. An officer whom she later identified as petitioner told Alonzo that he was going to arrest him if he did not leave, whereupon Alonzo left. [ECF No. 22-9 at 151, 163-64]. Petitioner told S.P. that he was going to take her to the police station if she did not "do [something] for him" and said that he needed to "double check" her. [*Id.* at 151-52]. Petitioner went inside her shirt and touched her bare breasts and touched her vagina from the outside of her clothes. [*Id.* at 152-54].

8.    *D.V.*

On September 2, 2002, D.V. and her boyfriend "Juan" were parked on the side of the road. [ECF No. 22-10 at 23]. An officer whom D.V. identified as petitioner pulled up, told them they were trespassing, and searched their car. [*Id.* at 23-26]. Petitioner searched Juan at the front of the car but D.V. could not see them because the trunk was open. [*Id.* at 29].

Petitioner then searched D.V. at the front of the car, which included going under her bra and touching her bare breasts. [*Id.* at 29-31]. Further, petitioner "put his fingers inside [her] vagina[.]" [*Id.* at 32]. Petitioner told D.V. that she must give him her license, drop Juan off, then meet him at a warehouse to retrieve it. [*Id.* at 34]. At some point, petitioner kissed or tried to kiss D.V. [*Id.* at 51-52].

D.V. dropped Juan off then met petitioner at an "empty warehouse." [*Id.* at 35, 38]. Petitioner tried to push her inside the police car and she started crying. [*Id.* at 41].

D.V. reported the incident to the police. [*Id.* at 46]. Petitioner ending up calling D.V. and the police listened to their conversation. [*Id.* at 47]. D.V. filed a civil lawsuit based on this incident. [*Id.* at 55].

9.    *Sergeant Comacho*

Sgt. Comacho, an MDPD investigator, did not find a record that petitioner had conducted a traffic stop of D.V. on September 2, 2002. [ECF No. 22-7 at 54, 58].[2]

10.    *Patricia Murphy*

Murphy was a latent fingerprint examiner with the MDPD. [*Id.* at 22-23] She concluded that fingerprints taken from D.V.'s car matched petitioner. [*Id.* at 35-36].

B.    Verdict and Direct Appeal

The jury convicted petitioner of both counts. [ECF No. 22-15 at 8-11]. The trial court sentenced petitioner to fifty years' imprisonment with two 10-year mandatory minimum sentences on each count to run consecutively. [ECF No. 21-2 at 4-6, 8-9; ECF No. 22-16 at 58-59].

Petitioner appealed. [ECF No. 21-2 at 12, 14]. On February 3, 2010, the Third District Court of Appeals ("Third District") affirmed without comment. *Brosky v. State*, 26 So. 3d 591 (Fla. 3d DCA 2010) (table). Petitioner did not seek review in the Florida Supreme Court or the U.S. Supreme Court. [ECF No. 1 at 2-3].

C.    Postconviction Litigation

On January 31, 2012, petitioner filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, [ECF No. 21-2 at 116], which he amended, [*id.* at 141]. The trial court denied this motion in a written order. [*Id.* at

---

[2] The state presented additional testimony and evidence to establish petitioner's guilt.

200]. The Third District affirmed without comment, *Brosky v. State*, 123 So. 3d 574 (Fla. 3d DCA 2013), issuing its mandate on November 4, 2013, [ECF No. 21-2 at 199].

On January 4, 2016, petitioner filed a motion to correct illegal sentence under Florida Rule of Criminal Procedure 3.800(a). [ECF No. 21-5 at 2]. On August 11, 2016, the trial court granted the motion, stating that petitioner's 10-year mandatory minimum sentence on count one was to run concurrently with the 10-year mandatory minimum sentence on count two. [*Id.* at 8].

On January 13, 2017, petitioner filed a petition for writ of habeas corpus. [*Id.* at 10]. The trial court denied the motion. [*Id.* at 29]. Petitioner appealed and the Third District affirmed without comment, issuing its mandate on August 14, 2017. [*Id.* at 27].

On November 9, 2017, petitioner filed a second habeas corpus petition, [*id.* at 34, 43], which the trial court denied, [*id.* at 46]. Petitioner appealed and the Third District affirmed without comment, issuing its mandate on January 28, 2019. [*Id.* at 67].

Petitioner filed his § 2254 petition on June 21, 2019. [ECF No. 1 at 1]. The state filed a response and supporting documentation. [ECF Nos. 20, 21, 22]. Petitioner did not reply.

## II.   Legal Standard Under 28 U.S.C. § 2254

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting
federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim--
>
>> (1) resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established Federal
>> law, as determined by the Supreme Court of the United
>> States; or
>>
>> (2) resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the
>> evidence presented in the State court proceeding.

Under § 2254(d)(1)'s "contrary to" clause, courts may grant the writ if the
state court: (1) reaches a conclusion on a question of law opposite to that reached by
the Supreme Court; or (2) decides a case differently than the Supreme Court has on
materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).
Under its "unreasonable application" clause, courts may grant the writ if the state
court identifies the correct governing legal principle from the Supreme Court's
decisions but unreasonably applies that principle to the facts of the case. *Id.* at 413.
"[C]learly established Federal law" consists of Supreme Court "precedents as of the
time the state court renders its decision." *Greene v. Fisher*, 565 U.S. 34, 38 (2011)
(citation and emphasis omitted).

An unreasonable application of federal law differs from an incorrect application of federal law. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation omitted). Under this standard, "a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Courts "apply this same standard when evaluating the reasonableness of a state court's decision under § 2254(d)(2)." *Landers v. Warden*, 776 F.3d 1288, 1294 (11th Cir. 2015) (citations omitted). That is, "[a] state court's . . . determination of the facts is unreasonable only if no fairminded jurist could agree with the state court's determination . . . ." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (citations and internal quotation marks omitted).

Under § 2254(d), where the decision of the last state court to decide a prisoner's federal claim contains no reasoning, federal courts must "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "It should then presume that the unexplained decision adopted the same reasoning." *Id.*

A contrastable situation occurs when the decision of the last state court to decide a federal claim contains no reasoning and there is "no lower court opinion to look to." *Id.* at 1195. In this case, "it may be presumed that the state court adjudicated

the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99 (citation omitted). Thus, "[s]ection 2254(d) applies even [though] there has been a summary denial." *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (citation omitted). Because § 2254(d) applies, and because the last state court decision is unreasoned and there is no lower court decision to look to, "a habeas court must determine what arguments or theories . . . could have supported[] the state court's decision[] and . . . ask whether [they] are inconsistent with [Supreme Court precedent]." *Richter*, 562 U.S. at 102.

### III.   Timeliness

The state contends that the petition is untimely. [ECF No. 20 at 19-22]. The undersigned agrees.

AEDPA imposes a one-year statute of limitations on the filing of federal habeas petitions. 28 U.S.C. § 2244(d)(1). Pertinently, the year commences on "the date on which the judgment became final by . . . the expiration of the time for seeking [direct] review[.]" *Id.* § 2244(d)(1)(A). Under this clause, "the judgment becomes final . . . when the time for pursuing direct review in [the Supreme] Court, or in state court, expires." *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). "[A] petition for a writ of certiorari to review a judgment in any case . . . entered by a state court of last resort . . . is timely when it is filed with the [U.S. Supreme Court] within 90 days after entry of the judgment." U.S. Sup. Ct. R. 13(1).

Here, the Third District affirmed petitioner's conviction on February 3, 2010, and he did not seek further direct review. *Supra* Part I(B). Thus, his conviction became final under § 2244(d)(1)(A) on May 4, 2010. *See Gonzalez*, 565 U.S. at 150; *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) (per curiam).

"The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under [§ 2244(d)]." 28 U.S.C. § 2244(d)(2); *see also Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005) (citation omitted).

Here, petitioner did not file his original Rule 3.850 motion until January 31, 2012 (i.e., nearly one year and nine months after his judgment of conviction became final). [ECF No. 1 at 3]. By that time, the one-year statute of limitations had expired. Therefore, neither this nor any postconviction motion filed thereafter would count toward statutory tolling. *See Tinker v. Moore*, 255 F.3d 1331, 1333 (11th Cir. 2001) (citation omitted). Consequently, the petition is untimely.

Petitioner contends that the trial court's order granting his Rule 3.800(a) motion and correcting his sentence constituted a new judgment that restarted his "one year limitation period" under AEDPA. *See* [ECF No. 1 at 35]. The undersigned disagrees.

Pertinently, AEDPA states: "'[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States[.]'" *Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1291-92 (11th Cir. 2007) (quoting 28 U.S.C. § 2254(a)).

"AEDPA's limitations period is applicable to 'a person in custody pursuant to the judgment of a State court.'" *Id.* at 1292 (quoting 28 U.S.C. § 2244(d)(1)(A)). "AEDPA, including its limitations provisions, [is] specifically focused on the judgment which *holds the petitioner in confinement*." *Id.* at 1293 (emphasis added).

Caselaw construing "judgment" under § 2254(a) and for the purposes of AEDPA's bar on second or successive habeas petitions informs the meaning of "judgment" under § 2244(d). *Id.* at 1292 ("The same AEDPA language the Supreme Court interpreted when it determined [whether the defendant] filed an unauthorized successive petition . . . appears in the statute of limitations." (citations omitted)); *see also id.* (stating that "judgment" under § 2254(a) "refers [to] the underlying conviction and most recent sentence that *authorizes the petitioner's current detention*" (emphasis added)).

The Eleventh Circuit has expounded the meaning of judgment under § 2254(a) and AEDPA's bar on second or successive habeas petitions. *See generally Patterson v. Sec'y, Fla. Dep't of Corr.*, 849 F.3d 1321 (11th Cir. 2017) (en banc). AEDPA's

text "makes clear that the only judgment that counts for purposes of [the bar on second or successive petitions] is the judgment 'pursuant to' which the prisoner is 'in custody.'" *Id.* at 1326 (quoting § 2254(a)). "The relevant question is not the magnitude of the change (to the sentence), but the issuance of a new judgment *authorizing* the prisoner's confinement." *Id.* at 1326-27 (citation omitted). Thus, when determining whether a resentencing constitutes a new judgment under AEDPA, "[t]he only question is whether the [new sentencing] order authorizes [the defendant's] confinement." *Id.* at 1327. For a resentencing order to authorize the defendant's confinement, it must expressly commit the defendant to correctional custody and/or vacate his sentence and replace it with a new one. *See id.* at 1325-27; *Booth v. Sec'y, Fla. Dep't of Corr.*, 729 F. App'x 861, 862-63 (11th Cir. 2018) (per curiam) (citing *Patterson*, 849 F.3d at 1326-27).

Here, the trial court originally sentenced petitioner to fifty years' imprisonment with two 10-year mandatory minimum sentences on each count to run consecutively. [ECF No. 21-2 at 4-6, 8-9; ECF No. 22-16 at 58-59]. Later, the trial court granted his Rule 3.800(a) motion and changed the sentence to fifty years' imprisonment with two 10-year mandatory minimums on each count to run concurrently. [ECF No. 21-5 at 8]. Unlike the judgment of conviction, the order correcting the sentence did not expressly commit petitioner to the custody of the Florida Department of Corrections ("FDOC"). *Compare* [ECF No. 21-2 at 8], *with*

15

[ECF No. 21-5 at 8]. Furthermore, the order correcting petitioner's sentence did not vacate his original sentence and replace it with a new one. *See* [*id.*] Indeed, the trial court entered the order "nunc pro tunc" to the date of the original sentence, *see* [*id.*], which further indicates that it is not a new judgment authorizing petitioner's custody, *see Wells v. Sec'y, Dep't of Corr.*, 769 F. App'x 885, 887 (11th Cir. 2019) (per curiam).

Petitioner might contend that the order correcting his sentence is a new judgment because it significantly changed his sentence and may ultimately result in a lower sentence. However, *Patterson* makes clear that a resentencing order that changes the defendant's term of confinement but does not expressly commit him to correctional custody, or was not entered after vacatur of a prior sentence, does not constitute a new judgment under AEDPA. *See* 849 F.3d at 1325-26; *see also Vaughan v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 554, 555-56 (11th Cir. 2019) (per curiam) ("[T]he relevant question is not whether the sentence has been changed, but whether there has been the issuance of a new judgment authorizing the prisoner's confinement." (citation omitted)).

Petitioner also might contend that this case is materially indistinguishable from *Ferreira*, which concluded that an order granting a motion to correct illegal sentence entered after the expiration of AEDPA's statute of limitations was a new judgment under § 2244(d). *See* 494 F.3d at 1288, 1292-93. True, like this case, the

order in *Ferreira* changed the defendant's sentence to reflect that his sentence on one count ran concurrently, not consecutively, to his sentence on another. *Ferreira v. Sec'y, Dep't of Corr.*, No. 03-cv-00859-PCF-KRS (M.D. Fla. Sept. 8, 2003), ECF No. 5-5 at 149.[3] However, unlike this case, the resentencing order in *Ferreira* replaced the defendant's sentence with a new sentence and expressly committed him to FDOC custody. *Ferreira v. Sec'y, Dep't of Corr.*, No. 03-cv-00859-PCF-KRS (M.D. Fla. Sept. 8, 2003), ECF No. 5-1 at 7-14, ECF No. 5-5 at 149-57. Likewise, the order in *Ferreira* "direct[ed] the [FDOC] to . . . perform [the] affirmative act," *Patterson*, 849 F.3d at 1324, of "grant[ing] the defendant any additional gain time occasioned by [the] order," *Ferreira v. Sec'y, Dep't of Corr.*, No. 03-cv-00859-PCF-KRS (M.D. Fla. Sept. 8, 2003), ECF No. 5-5 at 149. Thus, *Ferreira* is inapposite. *See Patterson*, 849 F.3d at 1326 (reasoning that a trial court's order changing a defendant's "term of imprisonment" was a new judgment because the "corrected sentence committed [the defendant] to custody of the [FDOC]" (citation omitted)).

    For these reasons, the petition is untimely.[4]

---

[3] The undersigned takes judicial notice of these records. *See Cash Inn of Dade, Inc. v. Metro. Dade Cty.*, 938 F.2d 1239, 1243 (11th Cir. 1991) ("A district court may take judicial notice of public records within its files relating to the particular case before it . . . ." (citations omitted)); *cf. Wells v. United States*, 318 U.S. 257, 260 (1943) (per curiam) (suggesting that federal courts may take judicial notice of the judicial records of other federal courts).

[4] Petitioner does not expressly argue that equitable tolling or actual innocence applies, [ECF No. 1 at 35-36], and his allegations do not suggest that either would apply here, *see generally* [*id.*]

## IV.   Merits

A.   Claim One

Even if the petition were timely, it would fail on the merits.

Petitioner contends that, for the state to convict him of sexual battery under Fla. Stat. § 794.011 (2012), it had to prove that he penetrated the victim's vagina with an "object." *See* [ECF No. 1 at 18]; *see also* Fla. Stat. § 794.011(1)(h) (2002). Further, he contends that the court instructed the jury that a finger is considered an object under state law. [ECF No. 1 at 18]. However, he contends that he "never placed his fingers or physically guided the victim's fingers to penetrate her . . . vagina." [*Id.* (internal quotation marks omitted)]. Thus, he concludes that the jury instruction was erroneous and violated due process. [*Id.* at 18-19].

In state court, petitioner last raised this claim in his second habeas petition. [ECF No. 21-5 at 34-43]. The trial court denied this petition on the ground that it was "without merit and successive." [*Id.* at 46]. In support, the court noted that petitioner filed an earlier habeas petition in which he raised the same argument. [*Id.*] The Third District affirmed without comment. *Brosky*, 262 So. 3d 188.

"[A]s here, where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (citations omitted).

"[A] federal claimant's procedural default precludes federal habeas review . . . only if the last state court rendering a judgment in the case rests its judgment on the procedural default." *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations omitted). "However, a state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citations omitted).

To be independent, the state procedural ruling "must rest solidly on state law grounds[] and [] not be intertwined with an interpretation of federal law." *See id.* (citation and internal quotation marks omitted). "State rules count as adequate if they are firmly established and regularly followed." *Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016) (per curiam) (citation and internal quotation marks omitted).

"Under Florida law, a petitioner is not permitted to file successive habeas corpus petitions that seek the same relief as an earlier petition if the successive petition is based upon circumstances that were known or should have been known when the previous petition was filed." *Griffin v. McNeil*, 667 F. Supp. 2d 1340, 1352 (S.D. Fla. 2009) (citing *Johnson v. Singletary*, 647 So.2d 106, 109 (Fla. 1994)); *cf. Jennings v. McDonough*, 490 F.3d 1230, 1247-48 (11th Cir. 2007).

Here, the trial court denied this claim as successive because petitioner raised it in a prior habeas corpus petition. [ECF No. 21-5 at 46]. This procedural ruling

rests solidly on a state-law basis that, as the above authority dictates, is firmly established and regularly followed. "Moreover, [petitioner] has not presented [the court] with any argument about cause and prejudice or a miscarriage of justice to overcome the procedural bar." *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1354 (11th Cir. 2012); *see also Griffin*, 667 F. Supp. 2d at 1352 ("For any defaulted claim, the petitioner bears the burden of proving cause and prejudice so as to receive federal habeas review.").

Accordingly, claim one is procedurally defaulted.

B.      Claim Two

Claim two, [ECF No. 1 at 19-20], repeats claim one and fails for the same reasons.

C.      Claim Three

Petitioner contends that the trial court's "failure or refusal to strike two [] jurors for cause denied him a fair and impartial trial." [*Id.* at 21]. In support, he contends that "juror King" had two negative experiences with law enforcement, one of which "greatly impacted her life [and led] her to candidly admit that hearing testimony . . . would bring back memories of her own experiences." [*Id.*] Further, King only "reluctantly admitted [that] she could be fair and impartial." [*Id.*]

"Juror Dietrich" worked for a company that petitioner's attorney was suing and had become "extremely heated" during a "mediation negotiation." [*Id.* at 22].

Although Dietrich stated that he "may be able to be fair and impartial," "he was still friendly with his colleagues that still work" at the company. [*Id.*]

"Both jurors King and Dietrich ended up serving on [the] jury." [*Id.*]

Petitioner raised this claim on direct appeal. [ECF No. 21-2 at 31-40]. The Third District rejected it without comment. *Brosky*, 26 So. 3d 591.

"The Constitution guarantees all criminal defendants an impartial jury." *Brown v. Dep't of Corr.*, 348 F. App'x 526, 527 (11th Cir. 2009) (per curiam) (citation omitted). "In determining whether a juror is impartial, [i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 527-28 (alteration in original) (citation omitted).

A trial court's finding of impartiality "is essentially one of credibility" and may "be overturned only for manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031, 1038 (1984) (citation and internal quotation marks omitted); *see also Skilling v. United States*, 561 U.S. 358, 396 (2010) ("In reviewing claims of this type, the deference due to [trial] courts is at its pinnacle[.]"). Mere "ambiguity in the testimony of the cited jurors who were challenged for cause is insufficient to overcome the presumption of correctness owed to the trial court's findings." *See Yount*, 467 U.S. at 1040.

Here, the Third District reasonably rejected this claim. During voir dire King stated that, despite her negative experiences with the police, she would "be able to

sit as a juror . . . and be fair and impartial[,]" not "bring [her] emotion into [the] situation," and "decide [the] case only [on the] facts and law[.]" [ECF No. 22-3 at 25, 33, 35]. The trial court declined to strike King for cause, stating that her responses and demeanor "were fine" and that she responded in a "very matter of fact" manner. [ECF No. 22-4 at 181].

For his part, Dietrich said that, despite the lawsuit, he did not have any "special feelings positively or negatively toward" defense counsel and that he would be "fair and impartial to [both petitioner and] the State[.]" *See* [ECF No. 22-3 at 38]; *see also* [*id.* at 41-42]. The court denied counsel's challenge to Dietrich, finding that there was "nothing to indicate[] . . . that he would not follow the law," that he was "very honest," and that he could be "fair and impartial." [ECF No. 22-5 at 19-20].

Petitioner has not shown that these findings were unreasonable. At best, he has identified minor ambiguities in King's and Dietrich's answers about whether they would be fair and impartial, which, absent more, fails to so show.

In sum, the Third District's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.

D.     Claim Four

Petitioner contends that counsel ineffectively failed to investigate several witnesses who would have strengthened the argument that the victim misidentified

him and "distract[ed] from the State's evidence," resulting in a more favorable outcome. [ECF No. 1 at 23-25].

The trial court rejected this claim, concluding that the record contradicted it because petitioner stated that counsel had thoroughly investigated witnesses and that he did not want counsel to call any more witnesses. [ECF No. 21-2 at 206, 207-08]. The Third District affirmed without comment. *Brosky*, 123 So. 3d 574.

To establish a claim of ineffective assistance of counsel, petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To prove deficiency, he must show that counsel's performance "fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688. To prove prejudice, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

It is "all the more difficult" to prevail on a *Strickland* claim under § 2254(d). *Richter*, 562 U.S. at 105. As the standards that *Strickland* and § 2254(d) create are both "highly deferential," review is "doubly" so when the two apply in tandem. *Id.* (citations and internal quotation marks omitted). Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Id.* Rather, "[t]he

question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Petitioner has the burden of proof on his ineffectiveness claim, *Holsey*, 694 F.3d at 1256, as well as the burden of proof under § 2254(d), *Pinholster*, 563 U.S. at 181 (citation omitted).

Here, the trial court reasonably rejected this claim. Petitioner stated on the record that counsel had thoroughly investigated witnesses and that he did not want counsel to call any more witnesses. [ECF No. 22-13 at 32-33; ECF No. 22-14 at 76-83]. Thus, there is a reasonable argument that counsel did not deficiently fail to investigate witnesses. *See Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995) ("[C]onsent [is] probative of the reasonableness of the chosen strategy and of trial counsel's performance."); *Pitts v. Sec'y, DOC & Fla. Att'y Gen.*, No. 2:15-CV-13-FTM-29MRM, 2016 WL 128559, at *5 (M.D. Fla. Jan. 12, 2016) ("If the Defendant consents to counsel's strategy, there is no merit to a claim of ineffective assistance of counsel." (citing *Gamble v. State*, 877 So. 2d 706, 714 (Fla. 2004))). Petitioner's unsupported and self-serving allegations, [ECF No. 1 at 23-25], fail to overcome the "strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance." *See generally Strickland*, 466 U.S. at 689.

In sum, the state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.

E.    Claim Five

Petitioner contends that counsel ineffectively failed to investigate surveillance video evidence that allegedly would have shown that his police car was not at the warehouse where the victim was assaulted. [ECF No. 1 at 26-27].

The trial court rejected this claim on the basis that it was "without merit and not supported by the evidence at trial." [ECF No. 21-2 at 211]. The Third District affirmed without comment. *Brosky*, 123 So. 3d 574.

Here, the trial court reasonably rejected this claim. The trial court found that, despite the presence of several cameras in the warehouse, "there was only one tape" and that "all of the video feeds were captured on one screen," and hence, "there were not multiple videotapes for review." [ECF No. 21-2 at 211]. The trial testimony and evidence supported these findings. *See* [ECF No. 21-4 at 122-23; ECF No. 22-6 at 82; ECF No. 22-7 at 105-09]. Furthermore, as the trial court found, the record showed that counsel investigated this issue before trial and raised it during opening argument. [ECF No. 21-4 at 125-34 (counsel's deposing witness about surveillance video from the warehouse); ECF No. 22-6 at 34-35 (counsel's arguing that there

were "16 cameras all around this warehouse" but that the sexual assault "the state [was] alleging [was] not on this tape")].

In sum, the state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.

## F.   Claim Six

Petitioner contends that counsel ineffectively failed to pursue a defense of "alibi/or misidentification." [ECF No. 1 at 27]. "Instead, [counsel] unreasonably argued that . . . . the victim was lying in order to pursue a civil suit against [petitioner] and Miami-Dade County." [*Id.*]

The trial court rejected this claim for the following reasons, [ECF No. 21-2 at 215-16], and the Third District affirmed without comment, *Brosky*, 123 So. 3d 574:

> [A] review of the evidence presented at trial demonstrates that a defense of alibi and/or misidentification would not have been successful. . . .
>
> First, in addition to the testimony of T.C. and Daniel Campos, . . . the State presented evidence from two other female victims that were stopped by Defendant and had similar experiences where Defendant conducted an inappropriate search. Second, there was other evidence to corroborate Daniel Campos's and T.C.'s testimony. Sharon Hinez, a DNA analyst, testified that a piece of a toenail found in the rear of Defendant's patrol vehicle was identified as belonging to Daniel Campos. Felix Libre testified that he and his girlfriend J.D. were stopped by Defendant on August 30, 2002, at approximately 10:30 p.m., which would have been immediately after the stop conducted on T.C. and Daniel Campos. Mr. Libre testified that during the stop, Defendant showed him a bag of marijuana that he had just confiscated

from another young male, which corresponded with the bag of marijuana that was confiscated by Defendant from Daniel Campos.

Additionally, the State also introduced evidence to support D.V.'s testimony. While D.V. was being interviewed by police detectives with Miami-Dade Police Department, Defendant called her cell phone. The police detectives did a controlled phone call and recorded D.V.'s conversation with Defendant. Additionally, Patricia Murphy, a latent fingerprint examiner for Miami-Dade Police Department, testified that fingerprints taken from D.V.'s vehicle were identified as belonging to Defendant, and fingerprints taken from Defendant's vehicle matched. D.V.'s boyfriend, Juan Sierra.

Based on all of this evidence and testimony, a defense of alibi and/or misidentification would not have been successful. Therefore, the decision to present a defense that the victims were interested in money based on subsequently filed civil lawsuits, was a tactical decision clearly within the discretion of defense counsel, and thus, the seventh claim is without merit and is summarily denied.

Here, the record supports the trial court's findings. *Supra* Part I(A). The trial court reasonably concluded that counsel did not deficiently fail to raise this futile theory. *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief." (collecting cases)).

In sum, the state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.

G.    Claim Seven

Petitioner contends that counsel ineffectively "failed to impeach or otherwise challenge the credibility of the victim." [ECF No. 1 at 29]. The trial court rejected this claim on the ground that counsel adequately cross-examined T.C. and attacked her credibility. *See* [ECF No. 21-2 at 213-14]. The Third District affirmed without comment. *Brosky*, 123 So. 3d 574.

Here, the trial court reasonably rejected this claim. The record supports the trial court's finding that counsel adequately cross-examined T.C. on the "areas" in dispute. *See* [ECF No. 21-2 at 214]. For instance, counsel cross-examined T.C. about whether she knew D.V.'s boyfriend Juan, whether she washed the car after the incident, and whether she knew about the allegations involving the other girls. *See, e.g.*, [ECF No. 22-12 at 111-12, 126]. Likewise, counsel cross-examined other witnesses to damage T.C.'s credibility. *See* [ECF No. 20 at 55-57 (citing relevant portions of trial transcript)]. Therefore, there is a reasonable argument that counsel's challenges to T.C.'s credibility "f[ell] within the wide range of reasonable professional assistance." *See generally Strickland*, 466 U.S. at 689.

In sum, the state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.

H.    Claim Eight

Petitioner contends that counsel ineffectively failed to contest the state's failure to preserve Campos's toenail, which allegedly went missing after undergoing DNA testing. [ECF No. 1 at 31-34]. Petitioner contends that, if preserved, the toenail would have shown that Campos was never in his police car. [*Id.* at 34].

The trial court rejected this claim on the merits, concluding that "the toenail clipping was clearly either consumed in testing, or remained in the control of the [MDPD] Crime Lab." [ECF No. 21-2 at 207]. Therefore, "the clipping was not lost, and there was no discovery violation that would have necessitated the need for defense counsel to ask for a [] hearing." [*Id.*] The Third District affirmed without comment. *Brosky*, 123 So. 3d 574.

Here, the trial court reasonably rejected this claim. Hinez's testimony supported the trial court's conclusion. [ECF No. 22-9 at 115-17]. Furthermore, petitioner's allegation that further DNA testing would have shown that the toenail did not belong to Campos is unsupported and speculative, which is "is insufficient to state a constitutional claim." *See United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980) (citation omitted)[5]; *see also Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th

---

[5] *Jones* is precedential in the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) ("[D]ecisions of the United States Court of Appeals for the Fifth Circuit . . . , as that court existed on September 30, 1981, . . . shall be binding as precedent in the Eleventh Circuit . . . .").

Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.").

In sum, the state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.

## V.     Evidentiary Hearing

Petitioner is not entitled to an evidentiary hearing. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing [under § 2254]."); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318 (11th Cir. 2016) (petitioner not entitled to evidentiary hearing under § 2254 if fails to allege "enough specific facts that, if they were true, would warrant relief" (citations and internal quotation marks omitted)).

## VI.     Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Cases. "If the court denies a certificate, the parties may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." *Id.* "A timely notice of appeal must be filed even if the district court issues a certificate of appealability." Rule 11(b), Rules Governing § 2254 Cases.

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). By contrast, "[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Here, the undersigned denies a certificate of appealability. Even though reasonable jurists would debate whether the petition is timely, reasonable jurists would not debate whether the petition states a valid constitutional claim. If petitioner disagrees, he may so argue in any objections filed with the district court.

## VII.   Recommendations

As discussed above, it is recommended that the petition [ECF No. 1] be DENIED; that no certificate of appealability issue; that final judgment be entered; and that the case be closed.

31

Objections to this report may be filed with the district judge within fourteen days of receipt of a copy of the report. Failure to file timely objections shall bar petitioner from a *de novo* determination by the district judge of an issue covered in this report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district judge except upon grounds of plain error or manifest injustice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 148-53 (1985).

SIGNED this 21st day of July, 2020.


_____
UNITED STATES MAGISTRATE JUDGE


cc:   Paul R. Brosky
      M61279
      Everglades Correctional Institution
      Inmate Mail/Parcels
      1599 SW 187th Avenue
      Miami, FL 33194
      PRO SE

      Jeffrey Robert Geldens
      Office of the Florida Attorney General
      444 Brickell Avenue
      Suite 650
      Miami, FL 33131
      305-377-5441

Fax: 305-377-5655
Email: jeffrey.geldens@myfloridalegal.com

Sandra Lipman
Office of the Attorney General
444 Brickell Avenue, Suite 650
Miami, FL 33131
305-377-5441
Email: sandra.lipman@myfloridalegal.com

Noticing 2254 SAG Miami-Dade/Monroe
Email: CrimAppMIA@MyFloridaLegal.com